# IN THE COURT OF APPEALS OF TENNESSEE,
## AT NASHVILLE

_____

<table>
<tr><td>

**HEATHER LYNN SCOTT**,

   Plaintiff/Appellee.

VS.

**GREGORY ALAN SCOTT**,

   Defendant/Appellant.

</td><td>

)
)
)
)
)
)
)
)
)
)
)

</td><td>

**FILED**

**April 30, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

Rutherford County Chancery Court
No. 93DR-1046

C.A. No. 01A01-9806-CH-00272

</td></tr>
</table>

_____

From the Chancery Court of Rutherford County at Murfressboro.
**Honorable Don R. Ash, Judge**


**Darrell L. Scarlett**, Murfreesboro, Tennessee
Attorney for Defendant/Appellant.


**Heather Lynn Scott**, Pro Se


OPINION FILED:

**AFFIRMED AND REMANDED**


                             **FARMER, J.**

**HIGHERS, J.**: (Concurs)
**LILLARD, J.**: (Concurs)

In this child custody dispute, the trial court denied Defendant Gregory Alan Scott's petition to prohibit relocation or, in the alternative, to change custody. Additionally, the trial court granted a counter-petition to increase child support filed by Plaintiff Heather Lynn Scott. Mr. Scott appeals the court's ruling with respect to both his petition and Ms. Scott's counter-petition. Ms. Scott also appeals, contending that the trial court erred in failing to order Mr. Scott to pay her attorney fees. For the reasons stated below, we affirm the ruling of the trial court.

## *Procedural History*

In October of 1993, Ms. Scott filed a petition seeking a divorce from Mr. Scott. The parties subsequently entered into a marital dissolution agreement providing that the parties' two minor children[1] should be placed in the custody of Ms. Scott and that Mr. Scott should pay $717.00 per month as child support. A final decree of divorce, which incorporated this agreement, was entered by the trial court in May of 1995.

In May of 1996, Mr. Scott filed a petition seeking an order that would prohibit Ms. Scott from removing the parties' minor children from the state of Tennessee. In the alternative, Mr. Scott requested a change of custody. Ms. Scott subsequently filed a counter-petition to increase the amount of Mr. Scott's monthly child support obligation. After hearing the pending matters, the trial court ruled that custody of the children should remain with Ms. Scott, that the parties' visitation schedule should be modified, and that the amount of Mr. Scott's monthly support obligation should be increased in accordance with the applicable child support guidelines without being reduced to reflect visitation exercised by Mr. Scott in excess of the amount contemplated under the guidelines. Consistent with this ruling, the court entered an order (1) denying Mr. Scott's request for an order prohibiting relocation, (2) denying Mr. Scott's request for a change of custody, (3) setting forth a modified visitation schedule, (4) increasing the amount of Mr. Scott's child support obligation to $1,067.00 per month, and (5) providing that each party is responsible for his or her own attorney fees. This appeal followed.

---

[1]At the time of the divorce, the parties' older daughter, Alyssa, was eight years of age and their younger daughter, Celina, was six years of age.

The issues raised by the parties on appeal, as we perceive them, are as follows:

I. Did the trial court err in finding that there had not been a material change of circumstances occurring subsequent to the parties' initial custody agreement?

II. Assuming such a material change of circumstances, did the trial court err in finding that it was in the best interest of the parties' minor children to remain in the custody of Ms. Scott?

III. Given that the parties' modified visitation schedule allows Mr. Scott to exercise more visitation than is contemplated by the child support guidelines, did the trial court err in denying Mr. Scott's request for a downward deviation from the amount of support prescribed by the guidelines?

IV. Did the trial court err in failing to order Mr. Scott to pay the attorney fees incurred by Ms. Scott?

To the extent that these issues involve questions of law, the trial court's ruling is subject to *de novo* review. *See, e.g., In re Estate of Hume*, 984 S.W.2d 602, 604 (Tenn. 1999)(citing *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997)). The factual findings of the trial court, however, are entitled to a presumption of correctness and must be upheld unless they are contrary to the preponderance of the evidence. *See, e.g., Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); T.R.A.P. 13(d).

*Child Custody*

When considering a petition to change custody, a trial court must engage in a two step analysis. First, the court must determine whether there has been a material change of circumstances arising subsequent to the initial decree awarding custody such that the welfare of the child demands a redetermination of custody. *See, e.g., Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. App. 1995)(citing *Dailey v. Dailey*, 635 S.W.2d 391, 393 (Tenn. App. 1981)). If the court finds that there has, in fact, been a material change of circumstances, it then seeks to devise a custody arrangement that is in the best interest of the child. *See, e.g., Varley v. Varley*, 934 S.W.2d 659,

665-66 (Tenn. App. 1996)(quoting *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. App. 1993)); Tenn. Code Ann. § 36-6-106 (Supp. 1998). When determining what would be in the best interest of the child, the court assesses the comparative fitness of the parties seeking custody, considering all relevant factors in light of the particular circumstances of the case. *See Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. App. 1996); *Matter of Parsons*, 914 S.W.2d 889, 893 (Tenn. App. 1995).

Consistent with the two step analysis set forth above, the threshold question in the instant case is whether there has been a material change of circumstances occurring subsequent to the filing of the parties' divorce decree in May of 1995. The trial court found that there had not been such a change of circumstances. On appeal, Mr. Scott challenges this finding, alleging six factors, which he contends are sufficient to establish a material change of circumstances, as follows:

(1)  Ms. Scott intends to relocate with the children to Maryland, where the children will be exposed to members of Ms. Scott's family who may pose a danger to or be a bad influence on the children;

(2)  Ms. Scott has an erratic work history;

(3)  Ms. Scott allowed the children's health insurance coverage to lapse;

(4)  Ms. Scott filed for bankruptcy;

(5)  Ms. Scott became pregnant with and has given birth to a child out of wedlock; and

(6)  Mr. Scott's personal and financial circumstances have improved.

We discuss each of these allegations separately. Our conclusion regarding the question of changed circumstances, however, is not based on evidence of any single alleged factor but instead is reached after consideration of all relevant evidence contained in the record.

Ms. Scott testified that, if the trial court denied Mr. Scott's petition to prevent relocation or change custody, she intended to move with the children to the state of Maryland so that she could be closer to her family. In *Taylor v. Taylor*, 849 S.W.2d 319 (Tenn. 1993), the Tennessee Supreme Court expressly held that relocation, in and of itself, is not a material change of circumstances sufficient to justify a redetermination of custody. *See id.* at 332. In *Aaby v. Strange*,

924 S.W.2d 623 (Tenn. 1996), the court clarified its holding in *Taylor*, stating that "a custodial parent will be allowed to remove the child from the jurisdiction unless the non-custodial parent can show, by a preponderance of the evidence, that the custodial parent's motives for moving are vindictive—that is, intended to defeat or deter the visitation rights of the non-custodial parent." *Id.* at 629. *See also Tyndall v. Tyndall*, 934 S.W.2d 57, 57 (Tenn. App. 1996). The court explained, however, that "a non-custodial parent's hands are [not] tied where removal could pose a specific, serious threat of harm to the child." *Aaby*, 924 S.W.2d at 629. According to the court, the non-custodial parent in such a situation may still seek a change of custody based on a material change of circumstances. *See id.*[2]

In the case at bar, the trial court expressly found that Ms. Scott's motives for relocating to Maryland with the children were not vindictive. Mr. Scott does not challenge this finding on appeal. Rather, he contends that the circumstances surrounding the relocation serve as evidence of changed circumstances warranting a redetermination of custody. Specifically, Mr. Scott argues that the environment to which the children would be exposed in Maryland is unstable and potentially dangerous, noting that the relocation would place the parties' children in close proximity to Ms. Scott's mother and Ms. Scott's two brothers, Steven and Bill.

Ms. Scott's mother owns two homes in Ocean City, Maryland, a condominium, which serves as her primary residence, and a two story house in a community called Ocean Pines. Ms. Scott testified that, if allowed to relocate to Maryland, she and the parties' children would be living rent free in the house owned by her mother. Although Ms. Scott's mother teaches concert piano approximately three to five days per week, she would be available at different times to assist Ms. Scott with child care. As noted by Mr. Scott, Ms. Scott's mother has been married four times and, at the time of trial, was in the process of getting another divorce. At the time of trial, Ms. Scott's brother Steven was twenty-one years of age and resided with his mother in her Ocean City condominium. Steven has a history of mental illness and has been treated for manic depression and paranoid schizophrenia. Mr. Scott fears that Steven may physically harm the parties' children. Ms.

---

[2]The Tennessee General Assembly recently enacted a statute setting forth the procedure and analysis to be used in cases of parental relocation. *See* Tenn. Code Ann. § 36-6-108 (Supp. 1998)(effective May 7, 1998).

Scott, however, testified that, at the time of trial, Steven was doing well and was not experiencing any psychological problems. She further testified, however, that, because she had not recently observed Steven's behavior, she would not be comfortable leaving the children alone with him. Ms. Scott's brother Bill resides in Baltimore. According to Ms. Scott, Bill has been a drug addict for a number of years and formerly engaged in "running drugs" from Miami to New York. At the time of trial, Bill was in a drug rehabilitation center in Westminster, Maryland. Ms. Scott admitted that she had previously allowed the parties' children to be around Bill under the mistaken belief that he was not using drugs. She further testified, however, that she would not allow the children to have future contact with Bill so long as she had any suspicion that he was using drugs and that she would never leave Bill alone with the children.

Mr. Scott also argues that Ms. Scott's work history is evidence of a material change of circumstances. Ms. Scott is a registered nurse. At the time of the parties' divorce, she was working at Middle Tennessee Medical Center and earned between $30,000.00 and $32,000.00 per year. Although Ms. Scott resigned from this position in May of 1996, she continued to work at Middle Tennessee Medical Center until July of 1996. According to Ms. Scott, she resigned from this position because she planned to relocate to Maryland. Shortly thereafter, however, she was served with a court order prohibiting her from removing the parties' children from the state of Tennessee. Ms. Scott remained unemployed until October of 1996 when she began working for the Rutherford County Health Department. She resigned from this position, in April of 1997 and, in that same month, began working at the Tennessee Rehab Center. In June of 1997, she resigned from her position at the Tennessee Rehab Center. According to Ms. Scott, this resignation occurred because she had conflicts with the director of nursing and because she was experiencing sickness associated with pregnancy. Ms. Scott remained unemployed until August of 1997, when she began working for Home Technology, a home health care agency, on an "as needed" basis. At trial, Ms. Scott testified that she had not worked for Home Technology since October of 1997, when she became employed by the Rutherford County School System as a substitute teacher. During the period of time that she substitute taught for the Rutherford County School System, Ms. Scott was experiencing contractions and other symptoms associated with her pregnancy, requiring her to take prescription medication. At trial, Ms. Scott testified that she had not worked as a substitute teacher since December of 1997. Although Ms. Scott was unemployed at the time of trial, she testified that she

looked forward to going back to work and intended to obtain employment after the court rendered its decision regarding child custody. During the pendency of the custody proceedings, Ms. Scott received an offer of employment from a hospital in Maryland. Ms. Scott was unable to accept this position, however, because she was unwilling to relocate without the parties' children. At the time of trial, Ms. Scott had contacted one hospital, one nursing home, and one health department in Maryland regarding potential employment opportunities.

As additional evidence of changed circumstances, Mr. Scott notes that, during the period of time that the parties' children were in the custody of Ms. Scott, there was a lapse in the children's health insurance coverage. At the time of their divorce, the parties agreed that Ms. Scott would obtain health insurance for the children through her employer and that Mr. Scott would pay the cost of this coverage. After Ms. Scott resigned from her job, Mr. Scott repeatedly asked Ms. Scott to obtain the necessary forms so that the children could be added to his health insurance policy. Ms. Scott called her employer on several occasions in an attempt to obtain these forms but had not received them at the time that the children's coverage lapsed on September 1, 1997. According to Ms. Scott, she mistakenly believed that the children's insurance coverage did not expire until October 1, 1997. Sometime after the coverage lapsed, Mr. Scott contacted Ms. Scott's employer directly, obtained the necessary forms, and subsequently purchased health insurance for the children through his own employer.

Mr. Scott also argues that Ms. Scott has demonstrated financial irresponsibility since the parties' divorce. During the period of time that Ms. Scott was unemployed in 1996, she fell behind on her mortgage payments and consequently received a letter of foreclosure. In order to delay the foreclosure, Ms. Scott filed for Chapter 13 bankruptcy. Ms. Scott subsequently attempted to convert the Chapter 13 bankruptcy into a Chapter 7 bankruptcy. The Chapter 7 bankruptcy was ultimately dismissed, however, because Ms. Scott failed to appear at a scheduled hearing. Ms. Scott testified that she did not receive notice of this hearing. Additionally, Ms. Scott indicated that, if the trial court permitted her to relocate with the parties' children, she intended to refile for bankruptcy in Maryland. Finally, Ms. Scott denied that the children had suffered in any way as a result of her involvement in bankruptcy proceedings.

Subsequent to the parties' divorce, Ms. Scott began dating a man by the name of Jim Luna. She and Mr. Luna engaged in an on and off relationship for approximately two years. At some point in the relationship, Ms. Scott became pregnant. According to Ms. Scott, the parties' children were very happy that they were going to have a new brother or sister. When Mr. Scott learned of the pregnancy, however, he became very upset. He questioned Ms. Scott about the pregnancy and, in front of the children, Ms. Scott commented that "it happens all the time" and that "there is nothing wrong with that." She gave birth to the child in January of 1998. According to Ms. Scott, the parties' children enjoy having a little brother. Mr. Scott argues that, by having a child out of wedlock and by making such comments in front of the children, Ms. Scott has failed to set a good example for the children and that such behavior is evidence of a material change of circumstances requiring a redetermination of custody.

Finally, Mr. Scott argues that his own personal and financial circumstances have materially changed since that parties' original custody agreement. At the time of the divorce, Mr. Scott worked as a design engineer for Mercer Corporation and earned $21,000.00 per year. He initially remained in the parties' apartment but later moved in with one of his brothers. At the time of trial, however, he was employed as a project engineer at Wright Industries and earned $54,000.00 per year. Mr. Scott has recently remarried and shares a three bedroom expandable home with his new wife Teresa Scott. At trial, the new Mrs. Scott testified that she has a very good relationship with the parties' children. Additionally, Mr. Scott indicated that, if the court granted his petition to change custody, the new Mrs. Scott would quit her job so that she could stay home with the children when they were not in school.

Based on our review of the entire record in the case at bar, we cannot say that the evidence preponderates against the trial court's finding that there has not been a material change of circumstances. There is no evidence that the failed marriages of Ms. Scott's mother have had any negative impact on the parties' children. Although we are somewhat concerned about the children's exposure to Ms. Scott's brothers, Ms. Scott assured the trial court that the children would not be left alone with Steven and would not have any contact with Bill if he was using drugs. We recognize that Ms. Scott's employment history has been rather inconsistent since the parties' divorce. It appears, however, that Ms. Scott initially became unemployed in anticipation of her relocation to

Maryland. Additionally, Ms. Scott's later period of unemployment was, at least in part, the result Ms. Scott's pregnancy and the birth of her son. We also note that, at the time of trial, Ms. Scott was eager to return to work and had inquired about possible employment opportunities in Maryland. It is undisputed that, subsequent to the divorce, Ms. Scott allowed the children's health insurance to lapse, apparently because she was mistaken about the date on which their coverage expired. Fortunately, there is no evidence suggesting that the children sustained any serious illness or injury during the brief period of time that they were uninsured. Additionally, we note that, at the time of trial, the children were insured through Mr. Scott's employer. Subsequent to the parties' divorce, Ms. Scott experienced serious financial difficulty and ultimately filed for bankruptcy. There is no evidence, however, that the children have suffered in any way as a result of Ms. Scott's involvement in bankruptcy proceedings. Rather, it appears that, although Ms. Scott was unable to pay her creditors during this period of time, she continued to provide for her children in the manner to which they had become accustomed. At the time of trial, Ms. Scott had recently given birth to a child out of wedlock. During her pregnancy, Ms. Scott made an isolated comment in front of the children indicating her belief that there was nothing inappropriate about the fact that she was pregnant. Although we share Mr. Scott's concern that, by becoming pregnant out of wedlock, Ms. Scott is not setting the best example for the children, we can find no evidence suggesting that the children have suffered any adverse consequences as a result of Ms. Scott's conduct. Finally, we recognize that Mr. Scott's personal and financial circumstances have improved since the parties' divorce. Specifically, we note that Mr. Scott has remarried and that the new Mrs. Scott has established a good relationship with the parties' children. Considering all of the evidence discussed above, however, we do not think that the changed circumstances in the instant case are such that the welfare of the children demand a redetermination of custody. Thus, we conclude that the trial court did not err in denying Mr. Scott's petition to prevent relocation or, in the alternative, to change custody.

In light of our finding with respect to the question of changed circumstances, we find it unnecessary to discuss whether a change of custody would be in the best interest of the parties' minor children.

***Child Support***

After ruling that the parties' minor children should remain in the custody of Ms. Scott, the trial court modified Mr. Scott's visitation schedule to take into account Ms. Scott's intention to relocate with the children to Maryland. The court then found that, under Tennessee's child support guidelines, Mr. Scott is obligated to pay to Ms. Scott $1,067.00 per month as child support. On appeal, Mr. Scott challenges the amount of his child support obligation, arguing that the trial court should have allowed a downward deviation from the amount prescribed by the guidelines.

When determining the amount of a parent's child support obligation, trial courts must apply as a rebuttable presumption the amounts set forth in the child support guidelines. *See* Tenn. Code Ann. § 36-5-101(e)(1) (Supp. 1998). Trial courts have limited discretion to deviate from these guidelines, however, in certain situations. *See Jones v. Jones*, 930 S.W.2d 541, 544 (Tenn. 1996); *Nash v. Mulle*, 846 S.W.2d 803, 805 (Tenn. 1993); *Bowers v. Bowers*, 956 S.W.2d 496, 499 (Tenn. App. 1997). The Tennessee rule regarding deviation from the guidelines provides in pertinent part as follows:

> (2) Deviation from the guidelines may be appropriate in other cases when the court finds it is in the best interest of the child(ren) including, but not limited to, the following:
>
> (a) In cases where the Department of Human Services has taken custody of the child(ren) pursuant to a neglect, dependant, or abuse action and where the parent(s) is/are making reasonable efforts to secure the return of the child(ren) to the family; and/or
>
> (b) In cases where physical custody of the child(ren) is more equally divided between the parties than occurs in a situation where one party has an average amount of overnight visitation as defined in 1240-2-4-.02(6).
>
> . . . .
>
> (5) In deviating from the guidelines, primary consideration must be given to the best interest of the child(ren) for whose support the guidelines are being utilized.

Tenn. Comp. R. & Regs. ch. 1240-2-4-.04 (1997).  Rule 1240-2-4-.02(6) provides as follows:

> (6)     These guidelines are designed to apply to situations where children are living primarily with one parent but stay overnight with the other parent at least as often as every other weekend from Friday to Sunday, two weeks in the summer and two weeks during holidays throughout the year.  These guidelines are designed to consider the actual physical custody of the child(ren), regardless of whether custody is awarded to one parent and visitation to the other or such an arrangement is ordered to be joint custody or split custody. In situations where overnight time is divided more equally between the parents, the courts will have to make a case-by-case determination as to the appropriate amount of support (reference 1240-2-4-.04).

Tenn. Comp. R. & Regs. ch. 1240-2-4-.02(6) (1994).  Interpreting this rule, the Eastern Section of this Court previously stated that the guidelines assume that the child is in the care of the custodial parent approximately 285 days per year and is in the care of the non-custodial parent during the remaining 80 days of the year.[3]  ***See Morgan v. Morgan***, No. 03A01-9705-CV-00166, 1997 WL 672063, at *2 (Tenn. App. Oct. 30, 1997).  ***See also Casteel v. Casteel***, No. 03A01-9703-CV-00073, 1997 WL 414401, at *2 (Tenn. App. July 24, 1997)("The parties concede that an allowance is factored into the Guidelines for the 80 days residency of the children with their father, and that if the children spend more time with the obligor than is assumed his child support payments should be reduced.").  Based on our calculations, however, we think that the rule assumes that child spends 265 days per year in the care of the custodial parent and 100 days per year in the care of the non-custodial parent.[4]

---

[3]It appears as if, in reaching this conclusion, the Eastern Section assumed that the "Friday to Sunday" visitation discussed in Rule 1240-2-4-.02(6) consists of only two days.  Additionally, the calculation of the Eastern Section apparently does not take into account that some of the non-custodial parent's weekend visitation overlaps with the non-custodial parent's summer and holiday visitation.

[4]In reaching this conclusion, we first calculated the amount of summer and holiday visitation that is contemplated by the guidelines.  According to Rule 1240-2-4-.02(6), the guidelines assume that the non-custodial parent is exercising two weeks of summer visitation and two weeks of holiday vacation for a total of twenty-eight days.  ***See*** Tenn. Comp. R. & Regs. ch. 1240-2-4-.02(6) (1994).  Next, we calculated the amount of weekend visitation that is contemplated by the guidelines.  Rule 1240-2-4-.02(6) states that the guidelines assume that the non-custodial parent is exercising visitation "every other weekend from Friday to Sunday."  ***Id.*** Interpreting this rule literally, we think that its drafters intended for the non-custodial parent's weekend visitation to consist of three days (Friday, Saturday, and Sunday), rather than only two days.  Thus, the amount of weekend visitation assumed under the guidelines is equal to twenty-

In the instant case, the modified visitation schedule allows Mr. Scott to visit with the parties' minor children a total of 113 days per year. Thus, this schedule affords Mr. Scott thirteen more days of visitation than are contemplated by the child support guidelines.[5] Although the trial court recognized this excess visitation, it declined to decrease Mr. Scott's child support obligation pursuant to Rule 1240-2-4-.04(2)(b), explaining as follows:

> Even though this goes more than what standard visitation is, I'm going to find that it is not appropriate to deviate from the Guidelines. The basis for that is that Ms. Scott is going to have to help with some of these transportation costs.

On appeal, Mr. Scott notes that the transportation expenses referred to by the trial court are solely the result of Ms. Scott's decision to relocate with the children to Maryland. We find, however, that the origin of these expenses is irrelevant. Regardless of the reason that Ms. Scott must incur the transportation costs, the end result is a reduction in the amount of money that Ms. Scott has available to use for the support of the parties' children. When deviating from the child support guidelines, the court's primary consideration is the best interest of the child for whose support the guidelines are being utilized. *See* Tenn. Comp. R. & Regs. ch. 1240-2-4-.04(5) (1997). Given Ms. Scott's recent financial difficulties and the impact that the transportation expenses are likely to have on her ability to support the parties' children, we do not think that it is in the children's best interest to allow a downward deviation from the guidelines. Thus, we find no error on the part of the trial court with respect to its calculation of Mr. Scott's child support obligation.

***Attorney Fees***

---

six weekends at three days per weekend for a total of seventy-eight days. This total must be reduced, however, to reflect that two of these weekends overlap with the non-custodial parent's summer and holiday visitation. Accordingly, only seventy-two days, rather than seventy-eight days, should be included as weekend visitation. When the amount of the non-custodial parent's summer and holiday visitation (twenty-eight days) is added to the amount of the non-custodial parent's weekend visitation (seventy-two days), the total amount of visitation contemplated by the child support guidelines is 100 days per year. It follows, then, that the child is assumed by the guidelines to be in the care of the custodial parent during the remaining 265 days of the year.

[5]Using the calculations of the Eastern Section of this Court, however, Mr. Scott has a right to exercise thirty-three more days of visitation than are contemplated by the child support guidelines.

In matters of child custody, trial courts are authorized by statute to grant attorney fees to the party to whom custody is awarded. *See* Tenn. Code Ann. § 36-5-103(c) (Supp. 1998). In the instant case, however, the trial court ruled that each of the parties is responsible for his or her own attorney fees. Ms. Scott argues on appeal that the trial court should have required Mr. Scott to pay her attorney fees. In support of this argument, Ms. Scott relies on ***Sherrod v. Wix***, 849 S.W.2d 780 (Tenn. App. 1992). In ***Sherrod***, the trial court initially awarded custody of the parties' infant son to Mrs. Wix. *See id.* Within months of this determination, Mr. Sherrod began investigating Mrs. Wix's activities. *See id.* He hired a private investigator, followed Mrs. Wix, and actually examined her garbage in an effort to obtain incriminating evidence against her. *See id.* Mrs. Wix subsequently obtained an order enjoining Mr. Sherrod from harassing her. *See id.* Mr. Sherrod then filed a petition to change custody. *See id.* During the course of discovery, Mr. Sherrod mailed to Mrs. Wix a questionnaire seeking personal information regarding her current marriage. *See id.* at 783. The questionnaire purported to be from "Modern Woman Research" and promised that, if returned within ten days, Mrs. Wix would receive a free subscription to a popular women's magazine. *See id.* Mrs. Wix completed and returned the questionnaire to a post office box that had been rented by Mr. Sherrod. *See id.* At the conclusion of the hearing on Mr. Sherrod's petition to change custody, the trial court (1) denied the petition, (2) found that Mr. Sherrod's conduct regarding the questionnaire constituted harassment in violation of the injunction, and (3) ordered Mr. Sherrod to pay Mrs. Wix's attorney fees. *See id.* at 783, 784. On appeal, we held as follows:

> Based on the facts of this case, the trial court properly determined that Mr. Sherrod should pay the legal expenses Mrs. Wix incurred in responding to his request for a change in the custody. Mr. Sherrod precipitated these proceedings, and the obsessive way he pursed Mrs. Wix prolonged the proceedings and added significantly to their expense. He did not ultimately carry the day, and many of his allegations were eventually found to be unwarranted.

*Id.* at 785.

Unlike Mr. Sherrod, Mr. Scott did not engage in any obsessive or harassing behavior that prolonged the custody proceedings or added significantly to their expense. Ms. Scott suggests that Mr. Scott prolonged the proceedings by calling as witnesses various family members who offered cumulative testimony. We disagree. Mr. Scott called only six witnesses during the one day

hearing on his petition to prevent relocation or change custody. Even assuming that some of the testimony of these witnesses was cumulative, we cannot say that the trial court's allowance of this testimony had any significant impact on the length or expense of the proceedings. Finally, although Mr. Scott admittedly did not prevail at the trial court level, his allegations were not unwarranted as were many of the allegations of Mr. Sherrod. Rather, the facts of the instant case were largely undisputed by Ms. Scott. In light of these undisputed facts, Mr. Scott apparently had genuine concerns regarding the welfare of the parties' children. Thus, we think that the facts of *Sherrod* are distinguishable from those of the case at bar.

The allowance of attorney fees in child custody cases is largely within the sound discretion of the trial court. *See, e.g., Smith v. Smith*, 984 S.W.2d 606, 610 (Tenn. App. 1997)(citing *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. App. 1992)). Absent an abuse of discretion, reviewing courts will not interfere with a trial court's ruling regarding this matter. *See id.* We can find nothing in the record of the instant case suggesting that the court abused its discretion. Accordingly, we uphold the court's denial of Ms. Scott's request for attorney fees.

*Conclusion*

Based on the foregoing, the ruling of the trial court is in all respects affirmed. Costs on appeal are assessed to Mr. Scott, for which execution may issue if necessary.

_____
FARMER, J.

_____
HIGHERS, J. (Concurs)

_____
LILLARD, J. (Concurs)